**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 230718-U

Order filed January 29, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| ALAN TRENT, as Independent Administrator of the Estate of AARON WHITE, Deceased, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| DAVID SOLORZANO, Individually and as an Agent of VINTAGE HEALTHCARE SERVICES, INC., VINTAGE HEALTHCARE SERVICES, INC., an Illinois corporation not in good standing, OLIVER N. AKANO d/b/a VINTAGE HEALTHCARE SERVICES, INC., and ENO AKANO d/b/a VINTAGE HEALTH CARE SERVICES, INC., Defendants (David Solorzano and Vintage Healthcare Services, Inc., Defendants-Appellees), | ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal No. 3-23-0718 Circuit No. 22-LA-495 |
| | ) ) | The Honorable Neal W. Cerne, |
| Defendants-Appellees. | ) ) | Judge, presiding. |

JUSTICE ANDERSON delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court erred in granting the defendant caregivers' motion for summary judgment on the theory that the defendants did not owe the decedent a duty of care.

¶ 2    In August 2020, Aaron White, a disabled person, drowned in a swimming pool after being transported there by his paid caregiver, David Solorzano. Alan Trent, White's brother and the administrator of White's estate, filed a negligence complaint against Solorzano and his employer, Vintage Healthcare Services, Inc. (VHS). In November 2023, the trial court granted summary judgment for Solorzano and VHS, finding that neither owed White a duty of care. We reverse and remand for further proceedings.

¶ 3                                  I. BACKGROUND

¶ 4    White had a history of health issues that included epilepsy, seizures, and diabetes. Based on those conditions, he qualified for services through the Illinois Department of Human Services' Home Services Program (the Program). The Program is largely structured and regulated by section 89 of the Illinois Administrative Code (the Code) (89 Ill. Adm. Code 676.10. *et seq.* (2022)). The Program was designed to prevent the unnecessary institutionalization of individuals who could be satisfactorily maintained at home at a lesser cost to the State. 89 Ill. Adm. Code 676.10 (2022). To be eligible for the Program, applicants had to have a severe disability that was expected to last at least 12 months or for the duration of their lives, along with a need for long-term care. 89 Ill. Adm. Code 682.100(e), (f) (2022).

¶ 5    Once accepted into the Program, participants' needs for various levels of care or assistance were assessed, and a service plan was created. Under White's service plan, he was eligible for the "Homemaker" level of services, which consisted of general support from trained and professionally supervised individuals to maintain, strengthen, and safeguard his functioning at home when no other responsible person was available or capable of providing the necessary monitoring. At his last assessment, White was determined to require assistance with eating,

2

bathing, grooming, dressing, transferring, preparing meals, laundry, housework, outside home, routine health, and being alone.

¶ 6　　Beginning sometime in late 2016, the Illinois Department of Human Services contracted with VHS to provide those services to White. VHS assigned Solorzano, a home healthcare worker, to work with White. The arrangement involved the provision of professional healthcare services under VHS's agreement with the State of Illinois and the applicable Code regulations.

¶ 7　　Among other things, the Code required Program providers to meet training requirements for supervisors and homemakers to ensure that, at a minimum, the Homemakers had knowledge of basic nursing care and first aid. 89 Ill. Admin. Code 686.200 (2022). VHS did not, however, require Solorzano to have basic nursing care and first aid skills to serve as a home healthcare worker. Although he began providing Homemaker services to White in late 2016, Solorzano never became fully familiar with White's medical diagnoses and needs despite being charged with taking him to scheduled medical appointments.

¶ 8　　During their relationship, Solorzano took White shopping, ran errands for him, and took him to swim at fitness facilities on an almost-daily basis. He also assisted White with dressing, bathing, cooking, and the other in-home needs listed in the service plan. VHS consented to Solorzano accompanying White in the pool area while White was swimming. Prior to the incident in question, White suffered multiple medical events while swimming, and those occasions included Solorzano aiding or rescuing White.

¶ 9　　On August 13, 2020, Solorzano brought White to swim at LA Fitness. At some point, Solorzano left the building to make a phone call. On his return, he was unable to see White through the glass surrounding the pool area. When he entered the pool area, he saw White submerged in the water. Solorzano and the manager of the fitness facility pulled White from the pool and

unsuccessfully attempted to resuscitate him. It appears that White suffered a seizure or other adverse medical event while in the pool before he drowned. White passed away on August 15, 2020.

¶ 10        In June 2022, Trent filed a negligence complaint against VHS, Solorzano, and several other VHS personnel. The complaint was subsequently amended, and certain defendants were nonsuited. The instant appeal involves only four claims: Counts I and II against VHS and Solorzano, respectively, for wrongful death, and Counts V and VI against VHS and Solorzano, respectively, alleging statutory claims under the Illinois Survival Act (735 ILCS 5/27-6 (West 2020)). After allowing limited discovery, the trial court conducted a hearing on the defendants' motion for summary judgment. Because the trial court found that no duty of care existed, it granted the motion for summary judgment. This appeal followed.

¶ 11                                    II. ANALYSIS

¶ 12        Summary judgment is proper where the pleadings, depositions, admissions, and affidavits, viewed in the light most favorable to the nonmovant, reveal no genuine issue as to any material fact, entitling the moving party to judgment as a matter of law. 735 ILCS 5/2–1005(c) (West 2022); *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106 (2007). While summary judgment is a "drastic measure," it is an appropriate tool when the movant's rights are clear and free from doubt. *Morris*, 197 Ill. 2d at 35. It should not be granted, however, if a reasonable person could draw different inferences from the undisputed facts. *Parkway Bank and Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 14.

¶ 13        On appeal, Trent argues that the trial court erred by finding that the defendants owed White no duty of care. "A legal duty refers to a relationship between the defendant and the plaintiff such that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the

4

plaintiff." *Choate v. Indiana Harbor Belt Railroad Co.*, 2012 IL 112948, ¶ 22. The existence of a legal duty is a question of law to be decided by the court on a *de novo* basis. *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 21; *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001).

¶ 14 Trent appears to make his case for a duty under three separate theories. The first theory involves the common law recognition of a duty; the second theory involves that of a voluntary undertaking. The third basis is the existence of a special relationship (*i.e*., custodian and ward (*see Stearns v. Ridge Ambulance Service, Inc*., 2015 Il App (2d) 140908, ¶ 10)). While the voluntary undertaking and special relationship theories both appear quite compelling, we ultimately need not consider them because the common-law theory is easily satisfied.

¶ 15 At common law, the determination of whether a relationship is sufficient to impose a legal duty of care generally hinges on four factors: (1) the reasonable foreseeability of injury; (2) the likelihood of injury; (3) the burden created by guarding against that injury; and (4) the consequences of imposing that burden on the defendant. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 22. "Any analysis of the duty element turns on the policy considerations inherent in [these] factors, and the weight accorded each of the factors depends on the circumstances of the particular case." *Id*. Trent contends that each of those four factors support imposition of a duty. We begin by examining the four factors in the common law test for determining whether a duty of care existed in a specific case.

¶ 16 A. Reasonable Foreseeability of Injury

¶ 17 During his deposition, Solorzano sought to downplay his own involvement with White's past medical events. He even denied having to rescue White in prior swimming encounters. However, Trent's attorneys challenged Solorzano's credibility by introducing two admissions. First, on the day of the incident, Solorzano told two of the officers who responded to the scene that

5

White had "numerous health issues, including a history of epilepsy, seizures, and diabetes." He even informed another officer that "about a year ago, White had been swimming in the pool and suffered a seizure." Second, at the hospital, Solorzano called White's brother Trent, and the call was recorded. The recording reveals that Solorzano informed Trent that he had "been through this" with White "more than a dozen times" and described other times when he rescued White after he had suffered similar medical events in the pool. In relevant part, the transcribed conversation was as follows:

"Mr. Solorzano: I am here at the hospital waiting to find out if they were able to resuscitate your brother or not. (Unintelligible) morning swimming and he had a seizure and went under.

Mr. Trent: Oh wow.

Mr. Solorzano: By the time I got him out of the water, I had to have somebody help me get him out of the water.

Mr. Trent: Huh.

Mr. Solorzano: So this isn't the first time this has happened. As you well know, I've been through this more than a dozen times.

Mr. Trent: No, I didn't know that.

Mr. Solorzano: Yeah, so now we are banned from Life Time Fitness permanently. And just in general this happened, I would get him up out of the water or hold him against the pool wall or push him out of the water and give him CPR, or, you know, my boss doesn't want us to be part of this thing with the water at the pool. They can do housework and shopping and meant to take to the doctor and stuff like that. But I do it for him, and we've been together for so long that that's why I, you know, I go in the pool with him. I am normally

with him in the water all the time, but they have this new rule at the pool where you can only be in there 20 minutes when somebody else is there.

So he was with these African-American ladies and they kind of know each other so they were walking back and forth and he was swimming and doing all that stuff with her. So I figured I had a few minutes to run out to the car and make a phone call.

*** I came back in and I saw that he was struggling in the water through the glass, and then I just made a big old noise to get through there. I couldn't jump in the water to pull him up, but if I pull him to the corner of the pool I normally can get him to just to come back. I couldn't get him out of the water. I was trying to lift him up. I couldn't. The manager *** the manager jumped in the pool with me to help."

Based on Solorzano's admission that White had repeatedly suffered from serious medical issues while in the pool, that had required Solorzano to rescue him, the incident in this case was reasonably foreseeable.

¶ 18        But, the defendants argue that a "swimming pool [] is an obvious danger" and that no duty existed because Solorzano "could reasonably expect that plaintiff appreciated the risk associated with the pool." *Mt. Zion State Bank & Trust v. Consolidated Communications*, 169 Ill. 2d 110, 120 (1995). While the dangers of a pool may generally be obvious, here the evidence shows that Solorzano had routinely monitored White during his swims, reducing the "obviousness" of the risk that he would be seriously injured. Unlike most pool users, White knew that Solorzano would be monitoring him, giving him an enhanced sense of security from the knowledge that his longtime caregiver would be available to aid him if needed, as he had done multiple times in the past.

¶ 19        The defendants contend that finding White's injury foreseeable would effectively mandate that all caregivers be trained as lifeguards, creating an absurd result. Our finding of foreseeability

7

is specifically premised on these unique facts. Here, Solorzano had repeatedly and consistently proven to be a critical safety resource for White even in the absence of any specialized training. By concluding that White's injury was reasonably foreseeable here, we do not expand the scope of the duties to be imposed on all home caregivers.

¶ 20                                    B. Likelihood of Injury

¶ 21        We turn next to the likelihood that White would be injured if he again became incapacitated by an adverse medical event while swimming. The inability to remain above the water after suffering a medical crisis presents an extraordinarily high risk of serious injury or death, making the likelihood of injury after becoming incapacitated in the water indisputable. Common sense and experience, as well as the Solorzano's admitted need to rescue White "more than a dozen times" in the past, dictate that this factor be found to favor the existence of a duty of care.

¶ 22                              C. Burden of Guarding Against Injury

¶ 23        In reviewing the third factor, we again consider Solorzano's own statements. He testified that he had routinely either remained in the pool area or entered the water with White to monitor and supervise him before this incident. In addition, Solorzano's presence at the pool was required because he provided White with transportation to and from the site. Because Solorzano's standard practice was to be present at the pool, and there is no persuasive evidence that he objected to the burden of that responsibility, the record strongly supports the finding that having Solorzano present to guard against White being injured while in the pool was not unduly burdensome.

¶ 24        Moreover, supervising and assisting White was integral to Solorzano's duties as a caregiver under the Program. To be eligible for Program services, White had to establish through a series of assessments that he was seriously impaired and required long-term care. Those assessments evaluated factors such as whether White required "supervision and/or assistance" and whether he

8

required services to avoid a "risk to the individual's health and safety." 89 Ill. Adm. Code 679.30(b) (2022).

¶ 25    Based on those assessments, White was found to qualify for a wide array of Program services, indicating that extensive caregiver supervision was vital to his welfare and safety. Indeed, in his final assessment, White was found to require help with virtually all the basic functions of daily life, including eating, bathing, grooming, dressing, transferring, preparing meals, laundry, housework, outside home, routine health, and being alone. He would have been unable to safely perform those routine tasks without the benefit of a caregiver's assistance and supervision. White's undisputed need for such an extensive range of services strongly favors a finding that he faced serious risks to his health and safety in the absence of the supervision and assistance of a caregiver, such as Solorzano, who was specifically hired to fill that role.

¶ 26                            D. Consequences of Imposing the Burden

¶ 27    Finally, we examine the consequences of imposing a supervisory burden on the defendants. We note that the Code requires all providers who participate in the Program to maintain insurance that both covers the negligence of the provider and its employees and indemnifies the Department of Human Services against liability. 89 Ill. Adm. Code 686.200(b)(11)-(13) (2022). The mandatory nature of that coverage protects the defendants from the financial effects of a high damage award, dramatically reducing the potential negative consequences of imposing a duty of care on them if a breach of duty is found.

¶ 28    In their arguments before this court, the defendants claim that Trent "has cited nothing to support his assertion that a part-time home helper is required to constantly supervise his client inside or outside the home, and if this Court were to find Solorzano had a duty to constantly supervise White while he swam, the Court would be expanding the burden on part-time home

9

helpers beyond recognition." That contention, however, vastly overstates the scope of the defendants' responsibilities when viewed under a reasonable duty of care. The key to the proper scope of duty is reasonableness. Contrary to the defendants' claim, they would not be tasked with guaranteeing White's safety at all times and in all places if required to act under a duty of reasonable care. We conclude that the consequences of imposing a duty of reasonable care on the defendants, who voluntarily participated in the Program, are not unduly burdensome. Thus, we conclude that all four of the factors of the common law test require us to recognize a duty of care on the defendants.

¶ 29                                   III. CONCLUSION

¶ 30        For the reasons stated, we reverse the Du Page County circuit court's grant of summary judgment and remand the cause to the trial court for further proceedings consistent with this order. Due to the procedural posture of this case, we do not express any view on the merits of the plaintiff's allegation that the defendants breached their duty of care. Rather, we only find that a duty of care existed.

¶ 31        Reversed and remanded.